ROBERT B. KEENAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
KEENAN v. COMMISSIONER
Docket No. 31063-87.
United States Tax Court
T.C. Memo 1989-300; 1989 Tax Ct. Memo LEXIS 312; 57 T.C.M. (CCH) 762; T.C.M. (RIA) 89300; June 20, 1989. Robert B. Keenan, pro se. Richard J. Wood, Susan N. Wasko and Robert N. Trgovich, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined the following deficiencies and additions to petitioner's and his deceased wife's Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(a) [1]
Sec. 6659
Sec. 6661
1979
$  8,943.00
$   447.00
$ 2,683.00
--    1980
20,933.00
1,047.00
6,280.00
--    1981
25,421.51 * 1,271.00
7,626.00
--    1982
51,779.00 * 2,589.00
4,318.00
$ 11,023.00
1983
7,191.00 * 360.00
--
1,798.00
1984
5,821.00 * 291.00
--
1,455.00
*315 Respondent also determined that petitioner was liable for the increased interest rate on tax motivated transactions regarding the entire underpayments for 1979, 1980 and 1981, $ 39,717 of the underpayment for 1982 and $ 2,799 for 1983. Sec. 6621(c), I.R.C. 1986. To avoid the necessity of obtaining appointment of an estate representative, on respondent's motion we dismissed the action of Edna Keenan, deceased, for lack of jurisdiction. The issues for our consideration are: (1) Whether Robert Keenan (petitioner) should be allowed deductions and credits related to the lease of an energy management device from OEC Leasing (OEC); (2) whether petitioner is liable for the section 6653(a), 6659, and 6661 additions to tax, as well as the section 6621(c), I.R.C. 1986, increased interest rate on tax motivated transactions related to the OEC venture; *316 (3) whether petitioner should be allowed an expense deduction for his investment in the MTA marketing program; (4) whether petitioner is entitled to deductions related to the purchase and leaseback of an aerobatic airplane; (5) whether petitioner is entitled to charitable deductions in excess of those allowed by respondent; (6) whether petitioner is entitled to deductions for taxes in excess of those allowed by respondent; (7) whether petitioner has substantiated deductions related to employee business expenses; (8) whether petitioner is entitled to a $ 7,000 bad debt deduction; and (9) whether petitioner is liable for section 6653(a)(1) and (2) additions to tax with respect to the deficiencies not related to the OEC venture. FINDINGS OF FACT Petitioner Robert B. Keenan resided in Camarillo, California, when the petition was filed in this case. The stipulation of facts and attached exhibits are incorporated herein by this reference. OEC Leasing
During 1982, petitioner was employed by United Airlines as a pilot. Facing retirement, petitioner began to look for income producing investments to provide for himself and his wife, who required a full-time nurse due to advancing *317 Huntington's disease. Petitioner relied on the advice of Donald Karr (Karr), an insurance salesman friend, who counseled petitioner concerning different investments. Karr had obtained information about the OEC investment from Charles Reitz, president of Western Financial Management (WFM) and leasing agent for OEC. Karr prepared a profitability analysis of the OEC program for petitioner. It showed the investment to be economically profitable using figures supplied by the OEC prospectus. Petitioner and Karr also visited another individual in Santa Barbara to discuss the OEC investment. The OEC transactions, as will be discussed in more detail below, involved the lease by a taxpayer of an energy management device from OEC Leasing, followed by its installation by a service company in the facility of an end user. Any energy savings would be split by the end user, the taxpayer, the service company and OEC. On December 27, 1982, petitioner entered into a lease agreement for an Energy Minder System III. He agreed to pay $ 25,000 first year's advanced rental. He paid this amount, plus interest, with two checks. The first, dated December 27, 1982, was in the amount of $ 10,000. The *318 second, dated June 28, 1983, was in the amount of $ 15,750. Petitioner also entered into a service agreement with Control Technology, Inc. (Control), agreeing to pay $ 3,000, plus some share of the energy savings. On December 27, 1982, $ 750 of the service fee was due, another $ 750 when Control found a suitable location, and the remainder when Control completed installation. An invoice dated July 23, 1983, for $ 750, which petitioner paid, notified petitioner that a location had been found at West Covina Hospital in West Covina, California. Sometime in early or mid-1983, OEC or Control invited petitioner to the West Covina Hospital to inspect his unit prior to installation. Before he could go out to inspect the device, he was told that the unit had been returned to the manufacturer for modifications. This was the first indication that the promotion was having some difficulty. Petitioner received more disturbing news commencing in 1984. He received a letter from Control alleging that OEC had not delivered the units to Control (for placed-in-service purposes) prior to December 31, 1982. OEC denied such allegations. In response to the allegations and counter-allegations, WFM *319 contacted lessees asking them to fill out a questionnaire about their units, asking whether the unit was installed, whether it was faulty, whether it was saving energy, etc. Apparently, the energy management devices, including the one leased by petitioner, had not been installed due to incompetent service or malfunctioning equipment. WFM's counsel informed petitioner they had instituted a class action suit against OEC and its affiliates, alleging securities fraud, and, in a letter dated March 16, 1984, asked investors to contribute $ 250 to its prosecution. Petitioner signed and executed a power of attorney in favor of WFM and contributed $ 250 to the "OEC Lessee Action Fund." In correspondence dated October 24, 1984, OEC informed petitioner that he would be in default under his lease agreement if he did not pay insurance premiums on the unit. OEC had purportedly obtained a master policy for all lessees, for which petitioner had been billed his pro rata share. Petitioner paid $ 458.40 for insurance and wrote to OEC that to his knowledge the unit had not been delivered or installed, that OEC had never intended to perform their contractual commitments and "It would appear as though *320 you want me to default on my lease agreement in order to somehow achieve relief from your obligations." As late as 1985, petitioner was receiving letters from OEC blaming the service companies for the program's difficulties. Petitioner wrote a letter to OEC, Control and WFM "appalled at the seemingly apparent lack of constructive effort to resolve the situation." WFM replied that petitioner had been dealing with criminals and had been ripped off, that the lawsuit was progressing, and that neither the deductions nor the credits taken for 1982 could be substantiated. The result of any such lawsuit is not known. Petitioner has never seen the unit he leased from OEC. The unit has not generated any income. Petitioner was aware of the effect of the energy and investment tax credits when he invested in the OEC program. On his joint return for 1982, petitioner claimed deductions of $ 25,000 for advanced rental, $ 3,000 for installation and $ 25 for travel expenses related to the OEC leasing venture. He also claimed investment and energy tax credits based on the purported $ 280,000 purchase price OEC paid for the EMS III. On his 1983 return, petitioner claimed a $ 605.40 business *321 interest deduction and $ 1,500 service fee related to the OEC venture. On his 1984 return, petitioner claimed $ 250 legal services and $ 458 insurance expense deductions related to OEC. The mechanics of the OEC transaction are identical in most respects to the transactions described in Soriano v. Commissioner,90 T.C. 44 (1988); Heasley v. Commissioner,T.C. Memo. 1988-408; and Kaba v. Commissioner,T.C. Memo. 1989-148. Briefly, it involved the purchase by OEC of devices to save energy in industrial and commercial facilities. These would be leased to investors, who in turn were to have them installed and serviced by an unrelated service company in the facility of a third-party end user. Any energy savings would be split by the investor and the end user, with a percentage of savings retained by the service company as service fees and OEC as rental payments. The energy savings would be retained by the participants in the following percentages: End-User:
50 percent
Service Company:
7.5 percent
Lessor (OEC):
31.88 percent
Lessee (Keenan):
10.62 percent
The end user was not required to make any payments, *322 other than sharing energy savings, in connection with their use of the devices. Prior to installation, the service company would conduct an "energy audit" to determine a suitable end-user location. The investor would also pay initial amounts for the first year's rental and an installation charge. The investor/lessee claimed tax deductions for advanced rental and installation charges, and investment tax credits, under section 48(d), based on the purchase price OEC paid for the units. The units themselves are electronic devices designed to regulate oil, gas, steam and electrical usage, thereby conserving energy to the end user. There are a number of such devices on the market. The cost of such a system is based upon its capabilities and the number of functions it can perform. The report prepared by respondent's expert [2] explains these factors in greater detail and we quote from it below: EXPLANATION OF ENERGY MANAGEMENT SYSTEM TERMS a. Number of points. A point is a physical device in the building which operates an actuator or *323 starter [load] or measures a temperature, status or similar parameter. The number of points a system can control or monitor is the most fundamental characteristic of a system for it establishes the system size. More points translates to more control, larger buildings and larger savings. Typical points for a system are: on-off control of a fan motor starter on-off control of a pump motor starter on-off control of a lighting contactor status input of a fire alarm status input of a fan failure temperature measurement of the outdoor air temperature measurement of the space. b. Functions performed. The functional capability of a system defines the extent to which the system can conserve energy and perform other tasks. Typical capabilities of systems include: Duty cycling: periodically switch equipment off for short periods of time Time-of-day: switch equipment on/off on a scheduled basis using the calendar, day of week or time of day Demand limiting: switch equipment off for short periods in order to avoid excessive (peak) electrical usage Temperature compensation: duty cycling and demand limiting can be enhanced by compensating for room temperatures
*324 Record keeping: maintaining data on utility or temperature measurements Optimum start-stop: using measured outdoor and indoor temperatures to determine the optimum equipment startup or shutdown Remote access: interface to the EMS by telephone using a terminal and modem Enthalpy optimization: controlling outdoor dampers on air handling units to minimize cooling Load prediction: anticipate cycling of loads and its effect on electrical demand Low level user programing [sic]: allow for the user to define a few unique sentences using an internal language Simple building security: monitor alarms on a secondary basis and notify appropriate terminals Custom applications: special sequences established to control large equipment such as chillers and boilers Maintenance management: provide equipment database, work orders, manning reports and other related reports Full HVAC [Heating Ventilation Air Conditioning] control (Direct Digital Control (DDC)): closed loop control using a sensor and analog output to maintain temperatures Full Fire and Security: approved primary monitoring of fire and security sensors Higher level programming: Fortran, Basic or other higher level *325 language programming. c. User Interface. The user interface impacts the ease with which the user can program the above functions and monitor the results. The types of interface are: LED [3] with Keypad: The most basic user interface is a keypad with the digits 0-9 and a few other function keys and a two to six digit LED display. Often with such an interface LED point lights are used to indicate on-off status or indicate the next programming operation to take place. ASCII terminal: An ASCII terminal is a standard computer terminal with a QWERTY keyboard and CRT display or hardcopy display. This type of interface typically allows for prompting for program inputs and simple reports. Multi-terminals: This type of system allows more than one person to be using the system at a time. For example, one person may be checking the status of equipment and the other may be changing schedules. Colorgraphics terminals: A colorgraphics terminal displays equipment schematically with realtime temperatures and status in appropriate locations. The salient features *326 and stated cost of the EMS III (1982 model) are tabulated below: EMS III
Points:
24 loads, 3 temperatures, demand input
Functions:
Duty cycling
Time-of-day
Demand limiting
Optimum start-stop
Temperature compensation
Remote access
Recordkeeping
Interface:
LED w/keypad
ASCII Terminal
Designated Cost:
$ 280,000
Cost per Point:
Approximately $ 10,000
The average cost per point for a random sampling of small units (4-125 points) is $ 305; medium units (50-750 points) averaged $ 230 per point; large custom (500-2000 + points) units vary from $ 500 to $ 1,200 per point. [4] In the general market place, the most expensive units were $ 8,213 (small) and $ 20,000 (medium). Large units must be custom built and may cost $ 50,000 or more. Installation charges may double the cost of a system. The energy management system market is a large market, heavily advertised in the trade. A unit comparable to the EMS III could have been purchased for approximately $ 4,800 in 1982. The fair market value of the *327 EMS III (1982 model) is $ 4,800. The ultimate profitability of the venture to OEC and its lessees was dependent upon a number of factors, including the initial advanced rental and installation expenditures, annual energy bill, actual cost savings to the end user, the rate of inflation for energy costs, and useful physical and economic life of the equipment. The advanced rental for an EMS III was $ 25,000 per unit, while installation was $ 2,150. [5] The minimum annual energy bill that would justify use of the EMS III was $ 90,000. Based on a 1982 Department of Energy (DOE) report, energy costs were forecast to increase, on the average, 3.8 percent (electricity -- 2.0 percent, gas -- 9.1 percent, oil -- 4.3 percent). This is a weighted average for the typical industrial/commercial fuel combination. Considering a 7-percent inflation rate, the annual rate of energy cost increase would be 10.8 percent. DOE reports for earlier periods had projected cost increases of some 20 percent. *328 Actual energy savings to a particular end user may vary significantly, depending on physical characteristics of the facility and energy conservation measures which may already have been taken. Industry reports predicted 5 to 12 percent savings with a maximum of approximately 20 percent. Actual savings are often less than projected. We agree with respondent's expert that 10 percent is a reasonable assumption. We must also evaluate the useful physical and economic life of the devices. Optimistic estimates of the engineering useful life of these units is 20 to 25 years. Engineering or physical useful life is the length of time the unit may remain operational with normal repairs. The units in question were warranted for only 1 year. Electronic equipment is also subject to obsolescence (economic useful life); while the unit is still operative, it may nonetheless be more cost-effective to replace it with newer, more efficient technology. These units are also subject to obsolescence or failure of the underlying climate control units (central heating or air-conditioning units). When these are replaced the new units often incorporate internal energy management control systems. *329 Thus, we conclude, as did respondent's expert, that these devices have a useful life of approximately 10 years. Using these assumptions, one can obtain projected cash flows for the lease of an EMS III unit. Discounting this future cash flow to present value, to take into account the time value of money, is a way we have used to measure the economic viability of these transactions. See Soriano v. Commissioner,90 T.C. 44 (1988); Heasley v. Commissioner,T.C. Memo. 1988-408; Kaba v. Commissioner,T.C. Memo. 1989-148. The discount rate reflects the risk of the venture and expected return. The prime rate in 1982 was approximately 15 percent. This is a considerably riskier venture due to chances of equipment failure, energy cost variability and failure to achieve expected savings. Twenty percent would be a minimum rate of return required by investors to compensate for that risk. In the industry, these systems are expected to pay back in 1 to 3 years, an approximate 30-percent return. Using the 20-percent rate, the discounted cash flow from the lease of an EMS III, consisting of anticipated payments from end users less advanced *330 rental and installation fees, is a negative $ 13,959 as computed by respondent's expert. [6] Thus, the lease of a unit is not an economically viable transaction. *331 MTA Marketing Program
On December 27, 1982, petitioner entered into an "Agreement for Appointment of Advertising Agency" (Agreement) with MTA and Associates, Inc. (MTA). Under the Agreement, petitioner acquired five units of the promotion at $ 14,000 per unit, for a total cost of $ 70,000. Under the Agreement, petitioner was to pay $ 17,500 cash as a down payment and sign a 5-year promissory note for the balance of $ 52,500. On December 27, 1982, petitioner issued a check for $ 7,000 and signed a promissory note for the balance of the down payment, $ 10,500. Petitioner consulted with Karr and an individual in Santa Barbara before investing. Karr recommended and "signed up" 27 to 30 people in the MTA program, and received a commission for each one. Petitioner relied on Karr and a booklet entitled "The MTA Opportunity" (prospectus) in investing. The tax opinion in the prospectus stated that the cost of a unit was fully deductible by an accrual basis taxpayer as an advertising expense. The prospectus promised that an investor could "Make a cash investment of as little as $ 3,500, yet realize no less than $ 14,000 in income tax deductions this year, as well as the opportunity *332 to take tax deductions in the future for much of your personal entertainment, travel, auto expenses, phone bills, etc." The Agreement was purportedly part of a marketing program for products manufactured by Adventures in Health (AIH). Petitioner was to receive a list of 766 "members." Petitioner was purportedly entitled to 7 percent of gross sales of AIH products purchased by members on his list. Any payments by members were to be put into an escrow account to be applied against required payments on the $ 52,500 note, with any remainder going to petitioner. It has not been shown how AIH products would be advertised or marketed to petitioner's members, although it likely involved petitioner and a videotape machine. Under the Agreement, petitioner was not obligated to make any payments on the $ 52,500 note until the member list was furnished. No member list was ever furnished. Therefore, petitioner had no obligation under the Agreement. Petitioner has not recruited any members or generated any sales. No videotape machine was ever furnished to petitioner. Petitioner claimed a $ 70,000 deduction in connection with the MTA program on his 1982 joint return. He also claimed *333 a $ 100 travel and entertainment expense deduction for the cost of traveling to Santa Barbara for investment advice related to the MTA venture. With respect to the MTA business, petitioner chose the accrual method of accounting. For his employee and his claimed airplane leasing business (see below), petitioner was on the cash method of accounting. Aircraft Leasing
In November 1977, petitioner purchased an Aerotek-Pitts S-2A aerobatic airplane. Petitioner leased the aircraft to Kenneth Johnson, doing business as Johnson School of Aerobatics, for use in training pilots to do aerobatic flying. Johnson also owned the dealership from which petitioner purchased the plane. Johnson paid petitioner varying amounts for use of the aircraft, ranging from $ 35 to $ 61 per hour. Johnson conveyed the lease to another individual to continue the business, who operated it from late 1981 until July of 1982, when Johnson took over again. Later, petitioner terminated this arrangement and leased the aircraft to Leigh Manelski, who agreed to pay $ 50 per hour for use of the aircraft. Under the various leases, petitioner paid for oil, gas, maintenance, hangar rent, insurance and other expenses. *334 During 1981 or 1982, fuel and insurance costs for airplanes increased drastically, making it difficult for either aircraft owners or lessees to operate at a profit. Petitioner did not maintain a separate bank account for the airplane leasing activity. Petitioner's records consist of canceled checks from his personal checking account. Some of the checks contain notations that they were for the leased aircraft, while many do not. He kept no records of income. The airplane had a meter of time spent in the air, from which the lessees would compile a log. The log was used to calculate income due petitioner. Records kept by Johnson reflect that petitioner received at least $ 8,741 in income in 1982 from airplane leasing. Meter readings for 1983 and 1984 generally corroborate the income amounts shown by petitioner on his returns for those years. The amounts would not exactly coincide because petitioner did not receive checks at regular intervals from the lessees during 1983 and 1984. During the period at issue, the plane did not appreciate or depreciate in value. The value of the plane might increase somewhat due to declines in airplane manufacturing. For the years 1979 through *335 1984, petitioner reported the following income, deductions, including depreciation, and losses with respect to his airplane lease activity: Year
Income
Deductions
Depreciation
Net Loss
1979
$  9,698
$ 24,483
$ 7,362
$ 14,785
1980
12,822
23,130
9,339
10,308
1981
18,646
30,213
6,678
11,567
1982
5,000
18,047
6,616
13,047
1983
9,750
24,352
5,926
14,602
1984
2,812
14,243
6,699
11,431
The various lessees kept flight logs of time spent in the airplane. Each month, or for longer periods after 1982, the lessee would calculate the hours flown, multiply that by the hourly rate, and send a check to petitioner. When the lessee incurred expenses, such as for hangar rent, he would bill petitioner, or deduct it from the lease payment. With respect to fuel, petitioner had an account with Shell Oil, to which the lessees could charge gasoline, and petitioner would be sent the bill. Petitioner very rarely flew the plane for his personal use. Petitioner owned two other airplanes during 1982, 1983 and 1984. Neither was operating during that period, although they did incur expenses *336 for repairs. Charitable Contributions
During 1982, petitioner contributed at least $ 100 to qualified political organizations, and $ 885 to qualified charitable organizations. During 1983, petitioner contributed $ 771 to qualified charitable organizations. In addition, during both years petitioner's wife was a member of Alcoholics Anonymous. She went to several meetings per week, and at some donated an amount of cash. On their joint returns for 1982 and 1983, petitioner and Edna Keenan claimed $ 1,500 and $ 1,457 in charitable contributions, respectively. Taxes
Petitioner had $ 10,547 in state income tax withheld in 1982. Petitioner also paid $ 755.27 in late filing penalties to the California Franchise Tax Board. Also in 1982, petitioner paid $ 48 to the Department of Motor Vehicles, $ 26 of which was a tax. Petitioner paid $ 181.37 to the city of Oxnard during 1982 for the Ventura County sewer district. Petitioner paid an amount each month. Included in the $ 181.37 are the following amounts represented by petitioner's checks to the city of Oxnard: January 2, 1992 [sic]
$ 17.48
March 8, 1982
14.22
April 18, 1982
15.80
May 28, 1982
17.40
August 30, 1982
17.40
September 18, 1982
17.13
November 2, 1982
16.05
November 29, 1982
16.59
*337 Petitioner deducted $ 14,013 on Schedule A of his 1982 income tax return for state and local taxes. Employee Business Expenses
Petitioner was employed by United Airlines as a pilot and later as a flight engineer. Pursuant to various collective bargaining agreements, United provided a fixed rate reimbursement for expenses while traveling, such as meals. Petitioner was supplied meals on some flights. Petitioner has a log that purports to be an accurate summary of expenses for meals and miscellaneous expenses each day. For almost all days listed there is an entry for breakfast, lunch, dinner and a snack. Entries for breakfasts ranged from $ 8 to $ 15. Most of the entries exceeded $ 10. Entries for lunch ranged from $ 13 to $ 20. Entries for dinner ranged from $ 20 to $ 27. Entries for snacks ranged from $ 5 to $ 13, with most entries exceeding $ 8. The meal expenses in his log for 1983 total approximately $ 7,900. The meal expenses in his log for 1984 total approximately $ 10,800. Petitioner's log reflects $ 76 in phone calls for 1984. Petitioner also delivered airplanes for a company called Southern Cross Aircraft Delivery when he was not flying for United. He *338 deducted, among other things, the following amounts, represented by checks to the following payees: Island Colony Hotel, Waikiki
$ 365.00
Cherry Creek Inn
507.72
Rains Shoe Co.
74.15
Petitioner did not report any income from Southern Cross in 1983 or 1984. On his tax return for 1983, petitioner claimed an adjustment to income of $ 1,838 for employee business expenses and $ 7,768 as a miscellaneous deduction for employee business expenses. Petitioner calculated his expenses for meals on Form 2106 attached to his return at $ 35 per day for 143 days, or $ 5,005. Respondent disallowed all of the adjustment to income and $ 2,887 of the miscellaneous deductions. On his return for 1984, petitioner claimed an adjustment to income of $ 3,456 for employee business expenses and $ 7,992 as a miscellaneous deduction for employee business expenses. Petitioner calculated his expenses for meals on Form 2106 attached to his return at $ 40 per day for 153 days, or $ 6,120. Petitioner also claimed $ 717 in phone expenses. Respondent disallowed all of the adjustment to income and $ 6,192 of the miscellaneous employee business expenses. Bad Debt
In 1982, petitioner *339 wrote a check for $ 7,000 to Gloria Greenamyer so that she could obtain additional flight training. Petitioner did not receive a note or other evidence of indebtedness. Petitioner anticipated that he would be repaid within 60 to 90 days. Greenamyer apparently moved to Denver, and petitioner attempted to contact her by contacting her employer, Continental Airlines, in 1984. Continental would not give petitioner her address or number. Airlines customarily do not give out information about employees. On his return for 1984, petitioner deducted the $ 7,000 as a nonbusiness bad debt loss. OPINION OEC Leasing
The first issue involves the propriety of deductions and credits claimed with respect to petitioners' lease of an energy management device, and the additions to tax related thereto. As previously noted, the transactions herein are similar to those already dealt with by this Court in Soriano v. Commissioner,90 T.C. 44 (1988); Heasley v. Commissioner,T.C. Memo. 1988-408; and Kaba v. Commissioner,T.C. Memo. 1989-148, and suffer from many, if not all, of the same infirmities. An otherwise normal product or service, *340 with a facially appealing and effective marketing approach, has been grossly distorted to achieve inflated and improper tax benefits and remove any underlying economic support. A common threshold for the claimed tax benefits is that the taxpayer must be engaged in a trade or business or in a transaction entered into for profit. Otherwise, no credits or losses are allowed. Sec. 183. Essential to such a showing is a demonstration that petitioners had an actual and honest objective of making a profit, giving greater weight to objective facts than petitioners' mere statements of intent. Soriano v. Commissioner, supra at 53; Beck v. Commissioner,85 T.C. 557 (1985); Siegel v. Commissioner,78 T.C. 659 (1982); Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The same or similar objective factors have been used to test both profit objective and economic substance of a transaction. Rose v. Commissioner,88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Rather than repeat our discussion in the Soriano case, we list *341 below the objective and subjective factors indicating that petitioner did not have the requisite profit objective. Profit means economic profit, independent of tax savings. Friendship Dairies, Inc. v. Commissioner,90 T.C. 1054 (1988); Herrick v. Commissioner,85 T.C. 237 (1985); Surloff v. Commissioner,81 T.C. 210 (1983). The investment tax credit is not a substitute for or component of economic profit. Friendship Dairies, Inc. v. Commissioner, supra.Therefore, we find it most probative that the discounted cash flow from the transaction, using objective assumptions, would be a negative $ 13,959. In other words, the $ 27,150 "price" ($ 25,000 advanced rental plus $ 2,150 installation) was approximately twice the present value of the expected future income stream, $ 13,191 (-$ 13,959 discounted cash flow plus $ 27,150 price). There would be wide variability in energy savings based on factors not in petitioner's control, including rate of energy savings, energy prices, and the installation site. Petitioner did not take an active interest in this all-important part of the investment. Rather, he passively relied *342 on Control, and did nothing after the initial investment. He did not see or inquire about the results of the energy audit, by which Control purportedly found a suitable end user. We would expect some minimal supervision activity, some care in assigning duties to others, in order to find a bona fide profit objective. See Flowers v. Commissioner,80 T.C. 914, 932 (1983). Petitioner did not obtain independent appraisals or other reports, nor did he do much, if any, outside investigation.[7] Petitioner was a pilot, having no expertise in energy equipment leasing. In addition, neither petitioner nor Karr attempted to verify or substantiate the figures provided by the promoters. Some independent indicator of profitability would be a most probative element in finding a profit objective, and that is lacking in this case. See Beck v. Commissioner, supra;Elliott v. Commissioner,84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). *343 The units ultimately did not generate any income for petitioner. See sec. 1.183-2(b)(6), (7), Income Tax Regs. Further, there is no evidence that the unit was ever installed, and there is considerable doubt whether it was operational. Finally, the first year's advanced rental exceeded the fair market value of the entire system. Based on the foregoing, we find that petitioner did not have an actual and honest profit objective with respect to the energy management lease, and no deductions or credits will be allowed. Soriano v. Commissioner, supra.
Petitioner's case also contains other defects, similar to Soriano v. Commissioner, supra. Because the fair market value of the EMS III is only $ 4,800, the pass through of the investment and energy tax credits would be limited to 10 percent of that amount. Sec. 48(d)(1)(A). There was a large market for these devices, and this market was the most appropriate barometer of fair market value. While respondent's expert admitted that installation charges could double the cost of a system, petitioner has not shown or argued that these charges would be permitted as part of the base for the energy or investment *344 tax credits. Moreover, even if the value were doubled, it would not approach the amounts claimed by petitioner on the return, or materially reduce the deficiency. Because no installation ever occurred, no energy credits would be allowed. Specially defined energy property must be installed in connection with an existing industrial or commercial facility. Sec. 48(1)(5). In addition, paying one year's advance rent in an amount in excess of the value of the entire system is not an ordinary or necessary business expense within the meaning of section 162. Soriano v. Commissioner, supra at 59. The $ 25 travel expense deduction was not adequately substantiated, and was, in any event, purportedly incurred in the investigation stage of the investment. As a start-up cost, it would not be deductible. Finally, petitioner deducted $ 4,500 related to the installation of his unit, $ 3,000 in 1982 and $ 1,500 in 1983. The total installation fee was only $ 3,000. Moreover, as an accrual basis business, petitioner could only deduct expenses when all events occurred fixing such liability. Sec. 1.446-1(c)(1)(ii), Income Tax Regs. Therefore, even assuming petitioner had a *345 profit objective, only $ 750 would accrue in 1982, as no other obligation was incurred until Control found an end user. When Control found an end user, ostensibly in 1983, another $ 750 would accrue. Upon installation, which in this instance never occurred, the final $ 1,500 would accrue. Therefore, as in Soriano v. Commissioner,90 T.C. 44 (1988), we find that no credits or deductions are allowable. The same economic distortion that was present in that case is present here. Petitioner strenuously claims he was not interested in tax benefits, but his actions belie his words. While he claimed to need current investment income, the investment would not break even, using petitioner's own assumptions, for 7 to 10 years. Moreover, he remains responsible for his report of tax to the Government, including the value of the device shown on his return. "[W]e cannot ignore the artificial inflation of the claimed value of the units * * *. Petitioners could have readily determined the fair market value of these units and, in the same manner, verified the assumptions and values asserted by the promoters." Soriano v. Commissioner, supra at 60. Respondent *346 also determined additions for negligence, overvaluation and substantial understatement with respect to deficiencies related to the OEC transaction. Negligence, within the meaning of section 6653(a), is the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967), cert. denied 389 U.S. 1044 (1968). Petitioner bears the burden of showing he was not negligent. Petitioner claimed substantial deductions and credits based solely upon values asserted by the promoters. In addition, petitioner is a pilot, not experienced in the field of energy management equipment leasing, and did not seek advice from anyone with such experience. Petitioner did not attempt to independently verify the assumptions and claims made by the promoter, including valuation of the unit, which exceeded 5,000 percent of fair market value. While petitioner argues the credits were not an important consideration, as previously indicated, he claimed the credits on his return and he is responsible for such valuation. In light of the extraordinary inflation of the units *347 and the large market for such devices, he was negligent with respect to the underpayments caused by the OEC transaction. We next consider the addition to tax determined for valuation overstatements. Section 6659 provides for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. The underpayment must be more than $ 1,000. Two hundred-eighty thousand dollars is substantially more than 250 percent of $ 4,800, the value of the EMS units. The disallowed credits for 1982 result in underpayments of more than $ 1,000. The overvaluation, exceeding 5,000 percent, was an integral part of our finding that the taxpayer lacked the requisite profit objective. See McCrary v. Commissioner, 92 T.C. ,slip opinion at 46-48 (April 17, 1989); Irom v. Commissioner,866 F.2d 545 (2d Cir. 1989). Thus, the section 6659 addition would mechanically apply to the disallowed credits. Soriano v. Commissioner, supra at 60. The addition would also apply to credits carried back to years before 1982. Soriano v. Commissioner, supra;Nielsen v. Commissioner,87 T.C. 779 (1986). *348 Respondent also determined additions to tax under section 6661 for substantial understatement of income tax liability. Section 6661 imposes an addition equal to 25 percent of a substantial understatement of income tax. Sec. 6661(a); Pallottini v. Commissioner,90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). However, the section 6661 addition is adjusted for that portion of an understatement attributable to a section 6659 valuation overstatement. Sec. 6661(b)(3). To the extent petitioner meets these threshold requirements, the section 6661 addition will apply. Heasley v. Commissioner,T.C. Memo. 1988-408; Kaba v. Commissioner,T.C. Memo. 1989-148. The amount of the addition and its applicability can be calculated in the Rule 155 computations. Section 6621(c) imposes additional interest on tax motivated transactions. The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax motivated transaction includes any valuation overstatement, as defined *349 in section 6659. Sec. 6621(c)(3)(A)(i). In addition, section 6621(c)(3)(A)(v) includes sham or fraudulent transactions within the scope of the additional interest section. Included in such transactions are those entered into without a profit motive and which were without economic substance. Patin v. Commissioner,88 T.C. 1086 (1987), affd. sub nom. Hatheway v. Commissioner,856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner,864 F.2d 93 (9th Cir. 1989). See also sec. 301.6621-2T Q4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50390 (Dec. 28, 1984); Cherin v. Commissioner,89 T.C. 986 (1987). Because the underpayments in this case were attributable to valuation overstatements, and transactions lacking in economic substance and profit objective, the additional interest applies. Petitioner argues that because section 6621(c) did not exist during 1982 that he should not be liable for the addition. The additional interest only applies to interest accruing after December 31, 1984. Sec. 144(a), Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 682. Increased interest accruing after *350 the effective date of section 6621(c) attributable to an earlier year's deficiency does not constitute a retroactive application of that section. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Moreover, Congress can constitutionally make an income tax statute retroactive, so long as it clearly signals an intent to do so. Brushaber v. Union Pacific R.R. Co.,240 U.S. 1 (1916); Stockdale v. The Insurance Companies,87 U.S. (20 Wall.) 323 (1873); Wiggins v. Commissioner, 92 T.C. (1989). The legislative history of the statute states that "The provision is effective with respect to interest accruing after December 31, 1984, regardless of the date the return was filed." (Emphasis added.) H. Rept. 98-861 (Conf.) 985 (1984), 1984-3 C.B. (Vol. 2) 239. Therefore, we reject petitioner's argument, and the additional interest applies. Solowiejczyk v. Commissioner, supra.
MTA Marketing Program
On his tax return for 1982, petitioner deducted $ 70,000 advertising expense and $ 100 travel expense with respect to his investment *351 in five units of the MTA marketing program. Petitioner has failed to meet his burden of proving that any amounts were deductible. Rule 142(a). The $ 100 expense was incurred in obtaining investment advice with respect to the program. As this was incurred prior to petitioner's entering business (assuming there was a business), for investigation, it was not deductible. Richmond Television Corp. v. United States,345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); Dean v. Commissioner,56 T.C. 895, 902-903 (1971). Petitioner has also failed to prove the theoretical underpinnings of the $ 70,000 advertising expense deduction. Petitioner purportedly "acquired" five units of something, we think the right to sell AIH products to 766 members. Because petitioner purportedly acquired something, the useful life of which extended beyond the taxable year, it would not be deductible in the first year. Section 1.461-1(a)(2), Income Tax Regs. Similar considerations exist with any "advertising" expense. It is not known how long MTA would conduct the advertising. Further, petitioner has not established *352 that he was in a trade or business. Merely acquiring a license or right to market a product does not put one in a trade or business of distributing that product. Jackson v. Commissioner,86 T.C. 492, 515 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). Petitioner (nor MTA, for that matter) did not do anything but acquire his five units in 1982, and did nothing in later years. Carrying on a trade or business comprehends considerable, continuous and regular activity, which petitioner has not shown. See Commissioner v. Groetzinger,480 U.S. 23 (1987). Finally, in any case, no deductions would be allowed in connection with the recourse note. Petitioner had no obligation in connection with the note until the membership list was provided. This was not provided. Therefore, no liability existed, and no deduction would be allowed. Sec. 1.446-1(c)(ii), Income Tax Regs.
From our perspective, considering the claims made in the prospectus, this was no more than a transparent attempt to trade dollars for tax deductions. There is no evidence in the record that any of the parties did any advertising or selling, and petitioner has not met his *353 burden of proof. Welch v. Helvering,290 U.S. 111 (1933). Airplane Leasing
As with the OEC transaction, the threshold issue with respect to the airplane lease is whether petitioner entered into and continued the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The regulations under section 183 set forth nine nonexclusive factors to aid in determining whether an activity was engaged in with the requisite profit objective. They are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure *354 or recreation. Sec. 1.183-2(b), Income Tax Regs. No single factor is controlling, and all facts and circumstances, including factors not listed, are to be considered. Abramson v. Commissioner,86 T.C. 360, 371 (1986). The regulations also state that "A change of operating methods * * * or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive." Sec. 1.183-2(b)(1), Income Tax Regs.
The first factor is the manner in which the taxpayer carried on the activity. Petitioner maintained an informal record keeping system. His expense records consisted of canceled checks. Meter readings for 1983 and 1984 corroborate his reporting of income. However, according to records kept by the lessee, petitioner underreported his income by approximately $ 3,700 in 1982. Petitioner's system provides the minimum financial information necessary to make business decisions. Sec. 1.183-2(b)(1), Income Tax Regs.
The second factor is the expertise of the taxpayer or his advisors. Petitioner was a pilot, experienced in flying planes. In addition, the lessees were also skilled pilots, and Kenneth Johnson also *355 owned a Pitts dealership. It would appear that petitioner knew what he was getting into when he leased the aircraft. Johnson also had some business expertise selling airplanes, but, apparently, he only leased one aircraft for the flying school. Sec. 1.183-2(b)(2), Income Tax Regs.
The leasing activity, by its nature, put the onus of much of the work on the lessee. Petitioner was not required to spend large amounts of time overseeing the activity. Sec. 1.183-2(b)(3), Income Tax Regs. While petitioner was a pilot, he rarely flew the airplane and it was not a recreational pastime. Sec. 1.183-2(b)(9), Income Tax Regs. The airplane had held its value, and could increase in value somewhat due to a decrease in the manufacture of airplanes. Sec. 1.183-2(b)(4), Income Tax Regs.
Petitioner leased the aircraft from 1977 to 1984 and never earned a profit. However, petitioner and Johnson testified that fuel and insurance expense escalated rapidly in 1981 and 1982, making it difficult to earn a profit. And, unlike the MTA andOEC activities, which did not earn any income, the airplane lease consistently generated amounts of gross income. Sec. 1.183-2(b)(6), (7), Income Tax Regs.
In *356 sum, petitioner's airplane activity was not recreational, nor did it produce disproportionately large noncash expenditures, such as depreciation, to shelter other income. Petitioner was an experienced pilot, with airplane experience. Therefore, we find that from 1982 to 1984 he continued the activity with an actual and honest profit objective. Respondent also contends we should disallow the losses for lack of substantiation. Preliminarily, the lessee's records expressly show, and we have found, that petitioner underreported his income for 1982 by approximately $ 3,741. Thus, his income from the airplane activity for 1982 must be increased. Petitioner introduced canceled checks to substantiate the expense deductions other than depreciation for the airplane activity. Petitioner has adequately substantiated the deductions for 1982, even after subtracting out checks with notations for the other airplanes. For 1983, petitioner has substantiated and is allowed $ 19,355.31 of the $ 24,351.81 deductions claimed. For 1984, petitioner has substantiated and is allowed $ 13,352.97 of the $ 14,242.62 deductions claimed. Charitable Contributions
The next issue involves the amount *357 of charitable contributions to which petitioner is entitled under section 170. Petitioner claims that in addition to amounts either substantiated or conceded by respondent ($ 785 for 1982 and $ 771 for 1983), that petitioner's wife made cash donations of $ 1,040 to Alcoholics Anonymous each year -- $ 5 per meeting at four meetings per week 52 weeks a year. Petitioner had no substantiation for the additional charitable contributions claimed, only his testimony. Nevertheless, we believe that petitioner's wife did make some cash contributions. We find that petitioner is entitled to additional cash contributions in the amount of $ 300 per year. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Therefore, petitioner is entitled to a $ 1,085 charitable deduction and $ 100 political contribution deduction for 1982 and a $ 1,071 charitable contribution deduction for 1983. Taxes
Section 164, during the years at issue, allowed a deduction for, among other things, state and local real and personal property taxes, state and local income taxes and state and local sales taxes. On Schedule A of his 1982 return, petitioner claimed a deduction for state and local taxes *358 of $ 14,013. In the notice of deficiency, respondent allowed $ 11,398, and at trial respondent conceded another $ 1,409. Remaining at issue is $ 1,206, consisting of the $ 755.27 late filing penalty, $ 181.37 sewer "tax," $ 22 for the Department of Motor Vehicles, and $ 247.36 of unknown origin. Respondent conceded that $ 26 of $ 48 paid to the Department of Motor Vehicles was a tax. The remainder, it was suggested, was a filing fee. Petitioner brought nothing but a canceled check to trial, which was not placed in the record. Petitioner has failed to elicit any evidence that the $ 22 was a tax. Therefore, because he has the burden of proof, petitioner cannot deduct the other $ 22. Similarly, petitioner has failed to elicit any evidence with respect to the $ 247.36, and thus that amount is also not allowable as a deduction. Next we consider the deductibility of the late filing penalty. Petitioner argues, based on the Internal Revenue Code and, supposedly, California law, that because late filing penalties are assessed and collected in the same manner as taxes, that they are taxes. Even if we could accept this premise (compare section 6662(b)), petitioner has not referenced *359 any California law to show the manner in which penalties are collected and assessed in California. In addition, we do not agree that the manner of assessment and collection is relevant to whether something is or is not a tax. In two previous cases, we have held that certain state late filing penalties are not taxes. Boyle v. Commissioner,T.C. Memo. 1975-307; Powell v. Commissioner,T.C. Memo. 1967-32. Finally, in an analogous context, the regulations expressly state that "A penalty, fine, interest, or similar obligation is not a tax * * *." Sec. 1.901-2(a)(2)(i), Income Tax Regs. Cf. section 162(f) and May v. Commissioner,65 T.C. 1114 (1976) (section 6651 late filing addition not deductible as interest or ordinary and necessary business expense). Therefore, these amounts are not deductible under section 164. Finally, petitioner asserts that amounts paid to the city of Oxnard were deductible sewer taxes. Respondent contends that the bills were for sewer service. Petitioner did not bring the monthly bills, but only his canceled checks, to substantiate the deduction. Because the bills came on a monthly basis, and differed in *360 amounts each month, in the absence of the bills themselves we conclude that the bills were for sewer service, not taxes. While petitioner testified that everyone in the neighborhood paid the same amount each month, we have difficulty accepting his explanation on this issue, and there is not enough other corroborating evidence to meet petitioner's burden of proof. Therefore, amounts paid to the city of Oxnard are not deductible taxes. Respondent allowed the full amount of sales tax deducted on petitioner's return. To the extent there are adjustments to income that may result in an increase or decrease in the allowable sales tax deduction, the parties may take that into account in the Rule 155 computation. Employee Business Expenses
Section 162 permits the deduction of ordinary and necessary business expenses in connection with the performance of services as an employee. The regulations require any taxpayer whose expenses exceed the total amount of reimbursement from his employer and who claims such excess on his return to substantiate the expenses claimed. Sec. 1.162-17(d), Income Tax Regs.
Section 274 and the regulations require written records to substantiate expenditures *361 with respect to meals or lodging while traveling away from home, superseding the doctrine of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). The regulations require that a taxpayer substantiate each element of an expenditure by adequate records or by sufficient evidence corroborating his own statement. Sec. 1.274-5(c), Income Tax Regs. The elements of an expenditure for travel, including meals, that must be substantiated are set forth in section 1.274-5(b)(2), Income Tax Regs. as follows: (i) Amount. Amount of each separate expenditure for traveling away from home, * * * except that the daily cost of the traveler's own breakfast, lunch, and dinner * * * may be aggregated, if set forth in reasonable categories, such as for meals * * *; (ii) Time. Dates of departure and return for each trip away from home, and number of days away from home spent on business; (iii) Place. Destinations or locality of travel, described by name of city or town or other similar designation; and (iv) Business purpose. Business reason for travel * * *. To meet the adequate records requirement, a taxpayer must maintain an account book, diary, statement of expense *362 or similar record and documentary evidence which, in combination are sufficient to establish each element of an expenditure. Petitioner's evidence, primarily his log book, fails for a number of reasons. Preliminarily, both the time and place of meals are not included in the log book. In addition, petitioner presented no additional corroborating documentary evidence for the meals, e.g., checks, bills or invoices. Further, petitioner could not remember the rate at which he was compensated for the meals by United. Finally, it does not appear that petitioner used the log book in preparing his return. For 1983, petitioner reported $ 5,005 for meal expenses when the log book total was approximately $ 7,900. For 1984, petitioner reported $ 6,120 in meal expenses when the log book total was approximately $ 10,800. For 1984, petitioner reported phone expense of $ 717, but only $ 76 was reported in the log book. In addition, we do not think the log book accurately reflects petitioner's meal expenses, or was maintained at or near the time of each expenditure. Sec. 1.274-5(c)(2), Income Tax Regs. For almost every day of travel there are entries for breakfast, lunch, dinner and a snack. *363 We cannot believe that petitioner paid for every meal, especially when, as a pilot, he could be fed on the plane. His records imply that he always left on his travel before breakfast, and could stop long enough for a sumptuous breakfast, lunch, dinner and snack, and always returned late in the evening. In addition, the amounts for items are extremely high. Petitioner's log for 1984 reflects close to $ 1,000 each month spent on food, including a $ 10 "snack" almost every day. Petitioner also presented three checks at trial to substantiate employee business expenses. Two of the checks, to hotels, petitioner claims were expenses incurred while delivering planes for Southern Cross. However, there are no memorandums on the checks, except for a "DC-3 Delivery" on one check that appears to have been made after the fact. In addition, petitioner did not report any income from Southern Cross in 1983. Without more, we cannot find that these checks were for deductible expenditures. The last check is to Rains Shoe Co., and petitioner did not indicate what this was for, or how it was deductible. Moreover, even if petitioner incurred deductible employee expenses, he has failed to submit *364 evidence showing that he could not have been reimbursed by his employer for the expense. Podems v. Commissioner,24 T.C. 21 (1955). See also Leamy v. Commissioner,85 T.C. 798, 810 (1985). Accordingly, we sustain respondent's determination on this issue. Bad Debt
Section 166(d) provides a short-term capital loss deduction for nonbusiness bad debts that become worthless during the taxable year. To qualify for the deduction, petitioner must show that the debtor intended to create a debtor-creditor relationship, that a genuine debt in fact existed, and that the debt became worthless during the taxable year. Sec. 1.166-1(c), Income Tax Regs.; Andrew v. Commissioner,54 T.C. 239, 244-245 (1970). We find that no valid debt was created. There was no note, no specific date of repayment, and no provision for interest. See Curry v. United States,396 F.2d 630 (5th Cir. 1968); Zimmerman v. United States,318 F.2d 611 (9th Cir. 1963); Root v. Commissioner,220 F.2d 240 (9th Cir. 1955). Petitioner testified that the loan would be repaid within 60 to 90 days, but did not make any *365 "collection" efforts until 1984. This lapse is to some extent probative evidence that a bona fide debt was not contemplated. Even the collection effort was something less than vigorous. Petitioner looked in the Denver phone book and called Greenamyer's former employer. Petitioner, a pilot himself, should have known that the employer would not give out information about employees. Even assuming there was a valid debt, we cannot find that the debt became worthless during 1984. The 60 to 90-day period expired in 1982. Sometime during 1983, petitioner lost or gave up any reasonable chance of finding Greenamyer. Petitioner did not attempt to locate her in 1983, and for all intents and purposes had abandoned hope of finding her. Therefore, no bad debt deduction is allowable. Negligence
Respondent also determined additions for negligence for the underpayments not related to the OEC venture. For the years at issue, section 6653(a)(1) provided an addition of 5 percent of the underpayment if any part of any underpayment was due to negligence. A part of the underpayments in this case were due to transactions that were primarily tax motivated. Under the circumstances of *366 this case, taking deductions for transactions that did not have a nontax profit objective was negligent. In addition, petitioner has not proven that any part of the underpayments were not due to negligence, so that the section 6653(a)(2) additions would also apply. See Welch v. Helvering,290 U.S. 111 (1933). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. * Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiency pursuant to section 6653(a)(2)↩
2. The reports of respondent's experts in this case, Soriano, Heasley and Kaba↩ are similar, and in many respects are identical.
3. Light emitting diode. This is apparently similar to the red or green on black display on a calculator.↩
4. We use figures provided in respondent's expert's report. Costs are list price using 20 units (small) and 5 units (medium).↩
5. This figure, provided in the promotional materials by OEC, is $ 850 less than the price charged by Control in petitioners' service contract. However, this difference is not critical to the outcome of this case.↩
6. We will briefly explain the methodology used by respondent's expert in reaching his conclusions. Discounted cash flow equals lessee's discounted percentage of energy savings minus advanced rental and installation expenses. The starting point for total energy savings is the minimum annual bill. This is projected into the future using the anticipated energy inflation rate, i.e., $ 90,000 X 10.8 percent = $ 99,720 -- the energy bill for year 2; $ 99,720 X 10.8 percent = $ 110,490 -- the energy bill for year 3, and so on. The energy savings rate is then applied to each year's annual energy bill, resulting in total projected energy savings. The lessee is entitled to 10.62 percent of this figure. The lessee's portion of savings is then discounted to present value using a 20 percent rate of return. The projection is extended for 10 years into the future, the anticipated useful life of the machines. Because the rate of return is built-in to the discount rate, any discounted cash flow greater than or equal to zero produces an economic profit.↩
7. After trial, petitioner moved to reopen the record to introduce appraisals performed by George Lemonides and Nicholas Arteca. We denied petitioner's motion. Even if we had granted petitioner's motion, these are the same appraisals previously considered in the Soriano case as part of the promotional materials, and would not alter the result reached in this case. See Soriano v. Commissioner,90 T.C. 44, 46-47↩ (1988).